E-FILED
Friday, 01 April, 2022  04:47:49 PM
Clerk, U.S. District Court, ILCD

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| BETH EDWARDS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:20-cv-01086-JES-JEH |
| | ) | |
| GENERATIONS AT RIVERVIEW, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER AND OPINION

This matter is now before the Court on Defendant Generations at Riverview, LLC's

Motion (Doc. 21) for Summary Judgment and Memorandum (Doc. 22) in Support. Plaintiff Beth

Edwards has filed a Response (Doc. 24) and Defendants have filed a Reply (Doc. 27). For the

reasons set forth below, Defendant's Motion (Doc. 21) is GRANTED.

### BACKGROUND

Plaintiff Beth Edwards has filed a two-count Complaint against Defendant Generations at

Riverview, LLC ("Generations"). Doc. 1. She alleges Generations retaliatorily discharged her in

violation of the False Claims Act, 31 U.S.C. §3730(h) and the Illinois False Claims Act, 740

ILCS 175/4(g)(1). Unless otherwise noted, the following facts are undisputed.

*Defendant's Statement of Undisputed Material Facts*

Generations is a skilled nursing facility, which specializes in short-term rehabilitation,

orthopedic and cardiac rehabilitation, and tracheostomy care. SOF ¶1.[1] On November 1, 2018,

Generations began operating a facility in East Peoria, Illinois, that was previously operated by

HCR ManorCare ("ManorCare"). SOF ¶2. ManorCare had hired Edwards as a business office

---

[1] Unless otherwise indicated, the Court takes the undisputed facts from Defendants' Memorandum (Doc. 22), cited as SOF ¶ ___.

manager in August 2017 and Generations retained her when it assumed operations. SOF ¶3.

Edwards' job duties included recording the resident information for skilled nursing residents into

the MEDI system ("MEDI"). SOF ¶4. MEDI is an electronic database used to report residents'

admissions, deaths, discharges, or other status changes. SOF ¶4. In Illinois, every skilled nursing

facility, with residents who rely on the State to pay for nursing services, uses MEDI to track

resident information. SOF ¶5. Such information includes the date of admission, date of

discharge, date of death, change in resident credit, third party liability, and requests for enhanced

care. *Id.* Facilities must report certain information into MEDI within specified deadlines e.g.

admissions within 45 days and deaths or discharges within 15 days of the occurrence. SOF ¶6.

When Generations took over the facility on November 1, 2018, it directed Edwards to

temporarily input resident information into MEDI using ManorCare's National Provider ID

("NPIN"). SOF ¶7. Each facility operator must have its own NPIN assigned before it can issue

invoices to the State for payment or receive payment for its services. SOF ¶17 (citing Doc. 22-2,

34:4-10, 39:5- 7; Doc. 22-3, 24: 12-14).[2] Although a facility must timely report resident

information in MEDI, it takes several months for the State to issue a new NPIN when a change

in operator occurs. *Id.* (citing Doc. 22-2, 34:23-35:2; Doc. 22-3, 12:3-8). Therefore, Generations

only used ManorCare's NPIN to record the State mandated resident information from November

1, 2018, through March 2019, while it waited for a new NPIN to be issued. SOF ¶18 (Doc. 22-2,

35:3-7; Doc. 22-3, 13:1-6). It did not submit any invoices to the State for public aid payment

until April 2019, after it received its NPIN from the State. *Id.*

---

[2] Plaintiff marks SOF ¶ 17, but only on the basis that it was a "common practice" for a successor-operator to temporarily use the predecessor's NPIN Doc. 24, at 6. Thus, the following statements from SOF ¶17 are considered undisputed.

Despite multiple instructions to do so, after November 1, Edwards refused to enter admissions and discharges into MEDI because she believed it was "immoral and incorrect." *Id*. Edwards first raised her concern in using ManorCare's NPIN with the skilled facility administrator Wade Cies. SOF ¶8. Cies told Edwards it was "okay" for this purpose; however, Edwards did not believe he provided "adequate information to tell her why it was okay, just that it was okay." SOF ¶8. Edwards also raised the same concern with Dawn Stroup, the administrator for the independent and assisted living facility adjacent to the skilled care facility. SOF ¶9. Stroup was not familiar with the Medicaid process, so she did not answer her questions. *Id*. Edwards also raised her concerns with a regional manager named Stacy and with Mr. Cies' successor but received no response. SOF ¶9. Subsequently, regional manager Stacy Hood and Corporate Analyst Kim Shelton instructed Edwards to enter admissions and discharges into MEDI. SOF ¶10. Edwards again refused to do so even after both assured her that it "was acceptable and legal to do MEDI admits and discharge[s] under Heartland [ManorCare]." *Id*. Edwards' principal complaint was that no one at Generations provided "documentation to prove … it was okay to do admissions or discharges under HCR [ManorCare]." SOF ¶11. Edwards' supervisor, Stacy Brenton, also explained to Edwards that she needed to enter admission and discharge information into MEDI, but Edwards refused. SOF ¶12. In sum, each Generations manager or supervisor that Edwards spoke to reassured her that it was "okay" to temporarily use a predecessor's NPIN for recording mandated admission and discharge information and explained it was "common practice" to do so, as Generations had done in the past when it acquired other operations. SOF ¶13.[3]

---

[3] Plaintiff marks the statements from her deposition in SOF ¶13 as disputed. However, she only disputes whether it was indeed a "common practice," based on the statement from the OIC. Doc. 24, at 6. Thus, SOF ¶13 is undisputed to the extent that Generations' managers made these statements to Edwards. As discussed in the Opinion below, they are relevant to Edwards' knowledge at the time.

Edwards did not believe she had received a "clear and valid response from anyone under the Generations management," so she contacted Gwen Boll who was Edwards' regional supervisor under ManorCare. SOF ¶14. Boll merely agreed with Edwards and said that the practice was inappropriate. SOF ¶14. Edwards then contacted the ManorCare legal department to report her concerns. SOF ¶15. The individual that Edwards spoke to opined that he believed the practice to be "unacceptable" but did not tell her that the practice was unlawful or illegal. SOF ¶15. In November, Edwards also called the Illinois Office of the Inspector General ("OIG") to inquire whether using a predecessor's NPIN was a practice they had encountered previously. SOF ¶16. The unnamed individual that Edwards spoke to did not tell her that the practice was illegal or fraudulent or advise her to file a complaint with the OIG. SOF ¶16. Edwards did not file a complaint with the OIG and had no further communication with the OIG. SOF ¶16. The OIG took no action following Edwards' call. *Id*. On December 13, 2018, Stacy Brenton, Generations' administrator and one of Edwards' supervisors, terminated Edwards for "inappropriate behavior." SOF ¶19.[4] Plaintiff disputes the details of her inappropriate behavior.

***Plaintiff's Statement of Additional Material Facts***

Edwards also listed the following additional facts. Generations must input resident data into MEDI; otherwise, it could not eventually be paid by the State or Medicaid for any residents from November of 2018 to March 2019. Pltf SOF ¶1 (citing Doc. 26-2, 17:6-15, 23:12-18, 39:22-40:5; Doc. 26-1, 16:4-11, 18:3-15, 24:11-21). Prior to April 2019, Generations could not enter resident data into MEDI unless it used ManorCare's NPIN because Generations' did not have an NPIN. *Id.*; Pltf SOF ¶2 (citing Doc. 26-2, 33:20-35:15). Edwards contacted the OIG

---

[4] Plaintiff makes SOF ¶ 19 undisputed, with no explanation. She then points the Court to her additional statement of facts, paragraphs 4 and 5. Based on those statements, Plaintiff seemingly disputes the details of her "inappropriate behavior," such as whether she was slamming doors, refusing to make eye contact, or discussing private business matters with a previous employer. Thus, the above is undisputed.

regarding the use of another provider's NPIN and she was told the OIG had not encountered such

a practice. Pltf SOF ¶3 (citing Doc. 25, 25:8-13). Generations disputes the accuracy and veracity

of what the unidentified OIG representative may have said to Edwards and objects to its

inclusion at summary judgment because it is hearsay for which no exception applies. Doc. 27, at

5. The Court will consider the statement for the purposes of Edwards' knowledge at the time,

rather, than the accuracy of whether this was a practice the OIG had previously encountered.  Pltf

SOF ¶4 states, "[a]lthough Stacy Brenton included in the Description of Violation that Beth

Edwards had admitted to disclosing private facility business, Edwards did not say that she

discussed private facility business with previous employers nor did she give any details of her

discussions with previous employers." *Id.* (citing Doc. 26, 25:3-26:4). However, as Generations

points out, this portion of Benton's testimony does not support Edwards' proposed statement of

fact. Rather, Benton testified Edwards disclosed she had contacted her prior employer

(ManorCare) to ask questions about billing. Benton perceived this statement to be an admission

from Edwards that she "discussed private facility business with previous employers," but

Edwards did not provide further details of the conversation. Therefore, Edwards is disputing

Generations' perception of her conduct, which was cited as one of the reasons it terminated her.

Edwards' dispute also belies her previous admission that she contacted Gwen Boll who was

Edwards' regional supervisor under ManorCare and contacted ManorCare's legal department

regarding her concerns about using a predecessor's NPIN. *See* SOF ¶14-15.

    Form 3654 is a form that is required to admit a resident into a skilled care facility or a

supportive living facility. Pltf SOF ¶6 (citing Doc. 25, 42:5-44:1). At some point, Edwards was

directed to submit a Form 3654 without consulting with the resident even though "proper"

submission of the form required information from the resident, which Edwards did not have. *Id*.

Generations disputes Pltf SOF ¶6 and argues it is immaterial because Edwards cannot amend her

allegations at the summary judgement stage. Doc. 27, at 6, 14 (citing *Zeidler v. A & W*

*Restaurants, Inc.*, 219 Fed. Appx. 495, 499 (7th Cir. 2007)). According to Generations, the

Complaint does not allege fraud due to the submission of a "3654 form" and Edwards conceded

in her deposition that the sole basis for her belief that Generations was committing fraud was its

use of ManorCare's NPIN. *Id.* (citing Doc. 25, 21:8-11, 23-24:2)). The Court agrees that

Edwards conceded the basis for perceiving fraudulent activity in her deposition and Complaint.

Furthermore, Edwards fails to explain, within the meaning of the False Claims Act, how such

action would have been fraudulent, how she attempted to stop it or report it, and if so, how it

factored into her discharge, which are at issue in this case.

## LEGAL STANDARD

Summary judgment is appropriate where the movant shows, through "materials in the

record, including depositions, documents, electronically stored information, affidavits or

declarations, stipulations … admissions, interrogatory answers, or other materials" that "there is

no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56. When presented with a motion for summary judgment, the Court must

construe the record "in the light most favorable to the nonmovant and avoid[] the temptation to

decide which party's version of the facts is more likely true." *Payne v. Pauley*, 337 F.3d 767, 770

(7th Cir. 2003). In resolving the motion, "[t]he court has one task and one task only: to decide,

based on the evidence of record, whether there is any material dispute of fact that requires a

trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

In order to withstand a motion for summary judgment, the nonmovant must "set forth

specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 250 (1986). If the evidence, however, is "merely colorable, or is not significantly probative" or merely raises "some metaphysical doubt as to the material facts," summary judgment may be granted. *Liberty Lobby*, 477 U.S. at 249-50; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Thus, in order to overcome the undisputed facts set forth in a defendant's motion for summary judgment, a plaintiff cannot rest on the allegations in his complaint but must point to affidavits, depositions, or other evidence of an admissible sort that a genuine dispute of material fact exists between parties. Fed. R. Civ. P. 56(e)(2); *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996). "[I]f the non-movant does not come forward with evidence that would reasonably permit the finder of fact to find in her favor on a material question, then the court must enter summary judgment." *Waldridge*, 24 F.3d at 920.

### DISCUSSION

The False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA"), makes it unlawful to "(A) knowingly present[], or cause[] to be presented, a false or fraudulent claim for payment or approval" to the United States government, or "(B) knowingly make[], use, or cause[] to be made or used a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A)-(B). An employee can pursue a claim for unlawful retaliation if she was discharged "because of lawful acts done by the employee . . . in furtherance of an action under" the FCA. 31 U.S.C. § 3730(h). The Seventh Circuit has interpreted this to mean a plaintiff must prove that she was engaged in protected conduct and was fired "because of" that conduct. *Halasa v. ITT Educ. Servs., Inc.*, 690 F.3d 844, 847 (7th Cir. 2012). Section § 3730(h) also protects an employee who is discharged for "other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h). "[O]ther efforts to stop" a violation of the Act includes reporting suspected misconduct to internal supervisors. *Halasa*, 690 F.3d at 847–48.

To determine whether an employee's conduct was protected, there are two components, a subjective belief and an objective belief. Courts look to whether "(1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances *might* believe, that the employer is committing fraud against the government." *United States ex rel. Uhlig v. Fluor Corp.*, 839 F.3d 628, 635 (7th Cir. 2016) (quoting *Fanslow v. Chi. Mfg. Ctr., Inc.*, 384 F.3d 469, 480 (7th Cir. 2004) (emphasis added)). In assessing the objective prong, courts consider the facts known to the employee at the time of the alleged protected activity. *Id*.

This is not an FCA case where an entity was billing for services it or particular individuals did not render or were not qualified to render. Nor is it a case where the plaintiff alleges an entity violated the FCA. Rather, this is a retaliation case where the Counts allege that Edwards was terminated because of her protected activity under the FCA.[5] In the Court's view, the dispositive issue at summary judgment is whether Edwards had reason to believe that Generations was committing Medicaid fraud by temporarily using ManorCare's NPIN to track residents' admission, death, and discharge information into the MEDI system while awaiting its own NPIN from the State after it assumed operations of a nursing home facility. Generations asks the Court to enter summary judgment on all of Edwards' claims because the undisputed facts demonstrate Edwards' refusal to enter resident information using ManorCare's NPIN is not protected conduct under the FCA, and Generations had lawful, non-retaliatory reasons for terminating Edwards. Doc. 22. According to Edwards, Generations' arguments fail because (A)

---

[5] The Parties agree the Court can apply an FCA analysis when addressing an Illinois FCA claim. Doc. 22, at 14; Doc. 24, at 10. Courts have often made this finding because of the similar language in the statutes and the parties' failure to argue otherwise. *See e.g.*, *United States ex rel Helfer v. Associated Anesthesiologists of Springfield, Ltd.*, No. 10-3076, 2014 WL 4198199, at *9 (C.D. Ill. Aug. 25, 2014); *Bellevue v. Universal Health Servs. of Hartgrove, Inc.*, 867 F.3d 712, 716 n. 2 (7th Cir. 2017) ("The IFCA 'closely mirrors the FCA,' and to date we have not found any difference between the statutes that is material to a jurisdictional or merits analysis.") (quoting *U.S. ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.*, 764 F.3d 699, 704 n.5 (7th Cir. 2014)). Likewise, the Parties do not argue there is any material difference between the statutes or the allegations in Counts 1 (FCA) and 2 (IFCA). Therefore, the Court's analysis of the FCA retaliation claim also resolves the IFCA claim.

the law does not require the "distinct possibility" of an FCA claim; (B) Plaintiff reasonably believed that Generations was committing fraud; and (C) Generations did not have a lawful, non-retaliatory reason for terminating Edwards. Doc. 24. The Court will address the Parties' arguments in the order Edwards has presented them.

### A.  Distinct Possibility of an FCA Claim

Defendant quotes *Fanslow* for the requirement that "an employee must show that an FCA action is a 'distinct possibility' at the time of … her actions[.]" Doc. 22, at 13 (quoting *Fanslow*, 384 F.3d at 479; *Unites States of America, ex. rel Themmes v. Hamilton Enterprises, Inc.*, 2005 WL 1268784 (E.D. Wis. May 26, 2005)). However, directly following that line in *Fanslow*, the Seventh Circuit Court of Appeals made clear, such a past statement by the court "was not meant to contradict the rule that does not require actual knowledge of the FCA[.]" *Fanslow*, 384 F.3d at 479–80. Rather, "[i]t implied instead that there is an objective component to the test for a claim under § 3730(h), as well as a subjective one." *Id*. *Fanslow* also emphasized, an employee does not need actual knowledge of the FCA for her actions to be protected under § 3730(h); otherwise, "only those with sophisticated legal knowledge would be protected by the statute." *Id.*

Likewise, Defendant's quote from *Brandon v. Anesthesia & Pain Mgmt. Assocs.*, Ltd., 277 F.3d 936, 945 (7th Cir. 2002) is unpersuasive. The court in *Brandon* applied the "distinct possibility of a *qui tam* action" requirement, which the Seventh Circuit has since distinguished and was decided before Congress amended the FCA in 2009 to include protection for employees who are discharged for "other efforts" to stop FCA violations. 31 U.S.C. § 3730(h). *See also U.S. ex rel. Grenadyor v. Ukrainian Vill. Pharmacy, Inc.*, 772 F.3d 1102, 1109 (7th Cir. 2014) ("[R]etaliation for filing an internal complaint (that is, a complaint with one's employer, as distinct from a lawsuit) is forbidden; the language of the amended statute is merely clearer.").

Thus, the "distinct possibility" is not required where the plaintiff alleges that she was terminated

for other efforts to stop an FCA violation, which is Edwards' argument here. Yet, she does not

articulate how such action fits the description of an FCA violation, as for example, it was a

"fraudulent claim *for payment*." *See* 31 U.S.C. § 3729(a)(1)(A)-(B). Her argument seems to be,

temporarily recording resident information using ManorCare's NPIN was fraudulent and illegal

because Generations has since taken over the facility, therefore such information should have

been inputted under Generations' NPIN, even though it did not exist yet.

### B.  Subjective and Objective Beliefs under the FCA

Turning to Edwards' subjective and objective beliefs, it is clear she believed in good faith

that Generations was committing fraud by using a predecessor's NPIN. The undisputed facts

demonstrate she refused to enter the resident information despite it being her job duty to do so,

remained adamant in her belief, consulted multiple co-workers about her concerns, and became

visibly unhappy at work because of her employer's disagreement with her. But the FCA does not

protect an employee who "imagine[s] fraud but lack[s] any objective basis for that belief . . .

'employees who use reports of fraud to better their own position, or who behave like Chicken

Little, impose costs on employers without advancing any of the goals of the False Claims Act.'"

*Lang v. Northwestern University*, 472 F.3d 493, 495 (7th Cir. 2006) (upholding the district

court's grant of summary judgment against an employee's FCA retaliation claim) (citing *Neal v.

Honeywell Inc.*, 33 F.3d 860 (7th Cir. 1994); *Fanslow*, 384 F.3d 469).

In assessing the objective prong, courts consider the facts known to the employee at the

time of the alleged protected activity. *Uhlig*, 839 F.3d at 635 (quoting *Fanslow*, 384 F.3d at 480

(emphasis added)). Defendant argues a reasonable person with Edwards' experience who

received internal assurances and a lack of concern from interested, external sources would not

believe Generations was committing fraud. In her Response, Edwards claims her belief was objectively reasonable because none of Generations' managers "present[ed] statutes or case law confirming their opinion," OIG and ManorCare confirmed that Generations' conduct was unacceptable, and Generations' entry of another provider's NPIN was "untrue" information, which resulted in payment from the government. Doc. 24, at 12. Edwards then cites to *United States ex rel. Rockey v. Ear Inst. of Chicago, LLC*, 92 F. Supp. 3d 804, 828 (N.D. Ill. 2015) to support her position that it was objectively reasonable to believe using another entity's NPIN could be fraudulent. In *Rockey*, a district court, in part, held that the plaintiff adequately pled an FCA retaliation claim in spite of the defendant's motion to dismiss.

*Rockey* can be readily distinguished from the case at bar. The most glaring factual difference is that the employer did receive payment from Medicare after inputting physicians' NPINs rather than audiologists' NPINs even though the claims should have been inputted under the audiologists' NPINs, per Medicare regulation. The plaintiff there was specifically in charge of inputting medical billing codes. Regarding Medicare reimbursement claim forms, she was instructed to change the names of rendering providers from that of treating audiologists to physicians even if the physicians had not performed the services. This resulted in the facility receiving more reimbursements that it should have received, had it correctly used the audiologists' NPINs. When the plaintiff confronted the employer, they "acknowledged and admitted to Rockey that they were well aware that their actions were improper," but "instructed and directed her to continue submitting claims in this manner" and to train another employee to do the same. *Rockey*, 92 F. Supp. 3d 804, 810. The employer told the employee that it had adopted that billing approach "at the suggestion of their accountant because it would allow them

to collect more money from Medicare." *Id*. Additionally, in *Rockey*, there was nothing preventing the employer from setting up NPINs for the audiologists or a delay in receiving new NPINs.

Here, there has been no indication that Generations was attempting to receive more reimbursement funds than it was entitled to for its services or admitted fault to Edwards and cited "more money" as the justification for its instruction. Rather, it is undisputed Generations used ManorCare's provider number merely to record the State mandated resident information from November 1, 2018, through March 2019 while it awaited the State's issuance of Generations' new NPIN. SOF ¶18. Generations did not submit any invoices for payment to the State until April 2019, after it received its NPIN from the State and well after Edward's termination. *Id*. Edwards does not even claim that she was in charge of billing codes, rather, she proclaims that her job duties included inputting resident information into MEDI. A portion of Shelton's deposition, which Edwards cites, confirmed that individuals tried to reassure Edwards that it was not billing public aid at the time, based on the data she was entering. *See* Pltf SOF ¶2. Moreover, each Generations manager or supervisor that Edwards spoke to reassured Edwards that it was only temporarily using a predecessor's NPIN to record mandated admission and discharge information, and such practice was common and legal. There was no indication in *Rockey* that the employer was implementing a temporary fix. Rather, it used physicians' NPINs to intentionally receive more money than it was entitled to.

Considering Edwards' knowledge at the time, no reasonable juror could find that her continued refusal to temporarily enter ManorCare's NPIN was objectively reasonable. Edwards knew there were state imposed deadlines for recording resident information; knew it was her duty to enter this information as she had in the past as a BOM for ManorCare; knew Generations was waiting for a new NPIN; and she concedes that ManorCare did not receive payment for its

services during the waiting period. It is unclear what Edwards expected Generations to do during this period — fail to keep records of patients it admitted and discharged despite the 15-day and 45-day deadlines to do so? *See* Doc. 22-1, at 38 (admitting Edwards needed a NPIN to even access the MEDI system). It is also unclear how Generations could have received payment when using ManorCare's NPIN, unlike, for example the employer in *Rockey* who received payment when it was using physicians' NPINs as opposed to audiologists' NPINs within the same company. If anything, Generations' behavior was more of a "regulatory noncompliance," as to its recordkeeping at the time. *See U.S. ex rel. Ziebell v. Fox Valley Workforce Dev. Bd., Inc.*, 806 F.3d 946, 951 (7th Cir. 2015). But the FCA is not "an all-purpose antifraud statute," *Allison Engine*, 553 U.S., at 672, 128 S.Ct. 2123 or a vehicle for punishing garden-variety . . . regulatory violations." *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 194 (2016). Even so, it is undisputed Generations never submitted a payment until it received its new NPIN in March 2019. Edwards does not claim that she knew Generations submitted claims for payments during this temporary time and she concedes in her brief that it did not. *Cf. e.g., Brandon*, 277 F.3d at 936 (involving an employee who filled out Medicare billing reports and had personal knowledge of overbilling through obtained corporate records and verification from public officials that these documents had been used to collect payments to which the employer was not entitled).

This case begs the question — how much is enough to dissuade an employee's beliefs? It is unfortunate that Edwards could not be convinced otherwise and finds herself in this position where she no longer works at Generations. But Edwards' conclusory insistence that anything short of a citation to statutes or caselaw is unpersuasive. Protections under the FCA focus on reasonableness and the employee's knowledge, based on the surrounding circumstances. It is undisputed that Generations had just initiated operations following ManorCare. Edwards spoke

to multiple managers and supervisors about her concerns. Each supervisor reassured Edwards

that it was "okay" to temporarily use a predecessor's NPIN for recording purposes and explained

it was "common practice" to do so, as Generations had done in the past when it acquired other

operations. A reasonable person in similar circumstances would find this sufficient particularly

after external sources did not confirm Edwards' position. Even when Edwards consulted OIG

and ManorCare, neither told Edwards the conduct was illegal or suggested she disregard her

employer's instructions. As Generations notes, Edwards fails to articulate whether she even told

OIG and ManorCare that the use of ManorCare's NPIN was temporary while awaiting a new

NPIN. Generations also remarks if ManorCare's counsel or the OIG believed Generations

actions were fraudulent, a reasonable person would expect either of them to take action to stop

the conduct. Although Generations' point is logical, there is nothing to suggest that either of

those entities would have been inclined or obligated to update Edwards on their investigations.

Regardless, Edwards has not provided sufficient evidence on which a reasonable jury could find

it was objectively reasonable for her to believe Generations was defrauding the government.

Therefore, the Court must enter summary judgment in Generations' favor.

### C.  Non-Retaliatory Reason for Discharge

Even though Edwards disputes the reason she was discharged, no dispute of material

facts needs resolved to find Edwards' FCA retaliation claim fails as a matter of law because she

did not engage in protected activity. *See Uhlig*, 839 F.3d at 635. According to Generations, it

terminated Edwards' employment because, as manager, she displayed inappropriate behavior

including slamming doors, appearing visibly angry, refusing to make eye contact or cooperate

with consultants, refusing to listen to explanations, and sharing Generations' business

information outside of the organization. Doc. 22, at 18. In her Response, Edwards maintains she

was terminated for her opposition to fraudulent acts by Generations. Doc. 24, at 14.

Alternatively, she disputes the basis for her termination and whether she committed such actions

cited by Generations for her discharge. *Id*.

Despite "disputing" her actions leading up to termination in her response to Defendant's

statement of facts, Edwards oddly admits, here, that she was unhappy, visibly angry, and refused

to make eye contact. Doc. 24, at 15. She only maintains that she did not slam doors. She also

terms Generations' response as "harassment" or "verbal assaults" but fails to explain what that

means. Summary judgment is not a time to be coy, rather, it is "the put up or shut up moment in

litigation." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010) (internal

citations omitted). The only actions described throughout the briefs are Edwards questioning

various colleagues and them disagreeing with her. Therefore, the Court disregards Edwards'

conclusory statements about "harassment" or "assaults." The only retaliatory action at issue is

Edwards' termination.

Even assuming Generations' terminated Edwards because of her refusal to temporarily

enter ManorCare's NPIN and behaviors she exhibited because of the disagreement between her

and Generations as to the legality of this practice, the FCA does not protect employees who are

insubordinate. *See U.S. ex rel. Marshall v. Woodward, Inc.*, 812 F.3d 556, 565 (7th Cir. 2015)

("[T]heir training did not authorize them to repeatedly refuse to resume working in the face of

direct commands from multiple supervisors and an investigation dismissing their concerns . . .

Woodward terminated Marshall and Thurman only after investigating their concerns, informing

plaintiffs that their concerns were unfounded, and giving plaintiffs multiple opportunities to

resume their assigned tasks."). Similarly, the undisputed evidence here demonstrates Edwards

refused to perform her job duties to enter resident information into MEDI for over a month

before she was ultimately terminated. During that time, multiple supervisors considered

Edwards' concerns, told her this was temporary while they awaited a new NPIN but had to

comply with state mandated resident information input, and gave her multiple opportunities to

perform her job duties by inputting the information as instructed but she continually refused. As

discussed above, no reasonable juror could find Edwards' position was objectively reasonable,

therefore, it does not matter whether Generations terminated her for that conduct. The FCA does

not protect employees' mere insubordination which "impose[s] costs on employers without

advancing any of the goals of the False Claims Act.'" *Lang*, 472 F.3d at 495.

### CONCLUSION

For the reasons set forth above, Defendants' Motion (Doc. 21) for Summary Judgment is

GRANTED. The Clerk is directed to close this case.

Signed on this 1st day of April, 2022.

s/James E. Shadid
James E. Shadid
United States District Judge